**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DIGNITY HEALTH d/b/a DOMINICAN HOSPITAL,<br><br>*Plaintiff*,<br><br>v.<br><br>THOMAS E. PRICE, M.D.,[1] *in his official capacity as Secretary of the United States Department of Health and Human Services*,<br><br>*Defendant.* | Civil Action No. 15-804 (RDM) |

**MEMORANDUM OPINION**

This case is before the Court on plaintiff Dignity Health's motion for summary judgment, Dkt. 13, and the government's cross-motion for summary judgment, Dkt. 15. Dignity challenges the Secretary of Health and Human Services's calculation of the Medicare "wage index," which is used to adjust Medicare payment rates to reflect differences in wage costs between different geographic areas, for the Santa Cruz area in 2004. Another hospital in the area failed to provide documentation to support its wage rates for the time period in question, leading to lower Medicare reimbursement rates for all hospitals in the area, including Dignity. Dignity's complaint asserts a single count, challenging the accuracy of the wage data the Secretary relied on in formulating the wage index. Dkt. 1 at 8-10 (Compl. ¶¶ 35-45). For the reasons explained below, the Court concludes that Dignity lacks Article III standing. The Court will, accordingly, dismiss the complaint for lack of subject matter jurisdiction and will deny both Dignity's motion

---

[1] In accordance with Federal Rule Civil Procedure 25(d), Thomas E. Price M.D. is substituted as the official-capacity defendant in this action.

for summary judgment, Dkt. 13, and the Secretary's cross-motion for summary judgment, Dkt. 15, as moot.

## I.  BACKGROUND

A.  **Statutory and Regulatory Background**

Medicare is a federally funded nationwide health insurance program for people aged sixty-five or older, those with disabilities, and those with end-stage renal disease.  *See* 42 U.S.C. §§ 1395 *et seq*.  For acute-care inpatient services, Medicare reimbursement operates under the Prospective Payment System ("PPS").  *Id.* § 1395ww(d); *see also Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 244–45 (D.D.C. 2015).  That system compensates hospitals on the basis of a pre-established formula tied to the national average cost of treating a given ailment or condition, rather than on the basis of the actual costs incurred in treating patients.  *See* 42 U.S.C. § 1395ww(d).  Congress intended for this system to "reform the financial incentives hospitals face and [to] promote efficiency in the provision of services."  *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1158 (D.C. Cir. 2015) (alterations and citation omitted).  The system thus aims to avoid rewarding hospitals for operating at higher-than-average cost.

At the same time, however, the system was not intended to penalize hospitals for operating in high-cost areas.  Wages and wage-related costs, in particular, "are a significant component of the Medicare payment that qualifying hospitals receive," and those costs "vary widely across the country."  *Regents of the Univ. of Cal. v. Burwell*, 155 F. Supp. 3d 31, 37 (D.D.C. 2016) (citation omitted), *aff'd mem.*, No. 16-5098 (D.C. Cir. March 2, 2017).  In recognition of this reality, Congress directed the Secretary of Health and Human Services to adjust the "proportion" of PPS payments attributable to "wages and wage-related costs" for "area differences in hospital wage levels[.]"  42 U.S.C. § 1395ww(d)(3)(E)(i).  To do so, the Secretary

must compute a "factor" that "reflect[s] the relative hospital wage level in the geographic area of the hospital compared to the national average," *id.*, which is commonly referred to as the "wage index," *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 914–15 (D.C. Cir. 2009).  In most cases, the geographic area for which a wage index is calculated corresponds to one of the "metropolitan statistical areas" ("MSAs") defined by the Office of Management and Budget.  42 C.F.R. §§ 412.63(b), 412.64(b).  The wage index is a ratio of costs in a geographic area to national average costs.  A wage index of 1.0 means a given area is average; an index above 1.0 indicates higher than average wage costs, and thus a correspondingly higher payment level through the PPS, and an index below 1.0 means a lower than average cost area, with lower PPS payments. *See Anna Jacques Hosp.*, 797 F.3d at 1159.  Because there are typically multiple hospitals in any MSA, each hospital's wage data affects the ultimate wage index for all hospitals in the area, and thus data errors or omissions by one hospital can lower (or increase) PPS rates for other hospitals in its area.

The Centers for Medicare and Medicaid Services ("CMS"), the component of the Department of Health and Human Services responsible for administering Medicare, calculates the wage index each year "on the basis of a survey."  42 U.S.C. § 1395ww(d)(3)(E)(i).  To gather the necessary information, CMS requires hospitals to submit their cost data to their "fiscal intermediaries,"—third party organizations, usually insurance companies, under contract with CMS to handle much of the direct administration of Medicare.[2]  *See Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 38.  Because it takes time for hospitals to complete and submit their cost reports, the wage index for any given year typically reflects costs actually incurred a few years

---

[2] "Fiscal intermediaries" are now known as "Medicare Administrative Contractors," but for simplicity the Court will use the "fiscal intermediary" appellation, which was in use at all times relevant to this case.

3

before.  *See, e.g.*, *2005 IPPS Final Rule*, 69 Fed. Reg. 48916, 49049 (Aug. 11, 2004) (calculating fiscal year 2005 wage index based on fiscal year 2001 data); *Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 38.

The process of calculating the annual wage index begins with the cost data—including total salaries and total paid hours—that hospitals must file annually with their fiscal intermediaries on Worksheet S-3.  *See Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 38; *Parkview Med. Assocs. L.P. v. Shalala*, 94-cv-1941, 1997 WL 470107, at *2 (D.D.C. Aug. 13, 1997).  The fiscal intermediaries conduct a "desk review" of that data to determine, among other things, whether the percentage cost increase reported by a hospital exceeds certain predetermined (but confidential) "edit thresholds."  CMS, Program Memorandum: Intermediaries, Annual Desk Review Program for Hospital Wage Data: Cost Reporting Periods Beginning on or after October 1, 1999, through September 30, 2000 (For FY 2004 Wage Index) (Oct. 4, 2002), Dkt. 21-1 at 352–54.  If any items "fall outside the established [edit] threshold[]," the fiscal intermediary must "address" those items and, where "necessary," make "adjustments."  *Id.* at 353.  "If adjustments are necessary," the fiscal intermediary "must communicate them to the affected hospitals" and must provide them with "an opportunity to respond."  *Id.*  The fiscal intermediary is also required to inform the relevant state hospital association if any hospital fails to respond to issues raised in the desk review process and to alert the association that "a hospital's failure to respond to matters raised by the [fiscal intermediary] can result in lowering an area's wage index value."  *Id*.  The fiscal intermediary must complete its review and transmit the relevant data—including any adjustments—to CMS by mid-November.  *Id.* at 352.

CMS then compiles and publishes a "preliminary public use" file containing the cost data from all hospitals in a given area, and it instructs the fiscal intermediaries to inform their

hospitals that the file is available and about the procedures and deadlines for requesting revisions to the data. *See, e.g.*, Proposed Changes to the Hospital Inpatient Prospective Payment System and Fiscal Year 2004 Rates, 68 Fed. Reg. 27,154, 27,193 (May 19, 2003) ("*Proposed 2004 Rule*"). CMS publishes the "preliminary public use" file on its website, and hospitals have a period of time to propose corrections to the data by submitting "complete, detailed supporting documentation" to their fiscal intermediaries. *Id.* The fiscal intermediaries then (1) revise the data, (2) notify hospitals whether they have accepted the proposed revisions and (3) explain why, before sending the revised data to CMS. *Id.* If a hospital continues to disagree with its fiscal intermediary's determination, it may raise the issue with CMS by the specified deadline. *Id.* 27,193–94. In conducting its review, however, CMS does "not consider issues such as the adequacy of a hospital's supporting documentation," because CMS "believe[s] that fiscal intermediaries are generally in the best position to make evaluations regarding the appropriateness of these types of issues (which should have been resolved earlier in the process)." *Id.* at 27,194.

After receiving the revised data from the fiscal intermediaries, the Secretary publishes a proposed wage index in the federal register as part of the proposed annual PPS rule. *Id.* At that point, a hospital may request changes to data only "in those very limited situations involving an error by the intermediary or CMS that the hospital could not have known about before its review of the final wage data file." *Id.* The Secretary then publishes the final wage index. *Id.* After the final index has been published, it is still possible for a hospital to seek a mid-year correction, but only "if [the] hospital can show that the intermediary or CMS made an error in tabulating its data." *Id.* A hospital may not seek a mid-year correction "to revise another hospital's data that may be affecting the requesting hospital's wage index." *Id.*

5

**B.     The 2004 Santa Cruz Wage Index**

This case concerns the wage index for the Santa Cruz MSA for fiscal year 2004. Three hospitals operated in the Santa Cruz MSA at the relevant time: Dominican Hospital, operated by Dignity Health, the plaintiff in this action; Watsonville Community Hospital; and Sutter Maternity & Surgery Center. Dkt. 21-1 at 5. The 2004 wage index was based on data compiled for fiscal year 2000. *Id.* The hospitals submitted their initial data in the fall of 2002, and on October 4, 2002, CMS issued a memorandum to the fiscal intermediaries outlining the process and timeline for processing that year's data and ultimately publishing the final wage index. Dkt. 21-1 at 403. The memorandum gave fiscal intermediaries until November 15, 2002, to complete and submit their desk reviews, and until early to mid-December to notify state hospital associations about any area hospitals that failed to respond to issues raised in the desk review process; it gave CMS until January 10, 2003, to publish the "preliminary public use" file on its website, and gave hospitals one month, until February 10, 2003, to request revisions to that data "and to provide documentation to support the request;" it gave fiscal intermediaries until April 4, 2003, to submit revised Worksheet S-3 wage data to CMS, gave hospitals until that same date to request CMS's intervention where they disagreed with the intermediaries' conclusions, and provided that the proposed rule would be published around early April; it provided that the final wage data "public use" file was to be released on May 9, 2003, and gave hospitals until June 6, 2003, to submit final correction requests to CMS and the fiscal intermediaries; and it set August 1, 2003, as the publication date and October 1, 2003, as the effective date for the final 2004 wage index. *Id.* at 413–15.

Watsonville's cost report for fiscal year ending July 31, 2001 reported average hourly wages of $26.78. Dkt. 21-1 at 107. That figure exceeded its *as-reported* hourly average of

6

$24.87 for fiscal year ending July 31, 2000, *id.* at 106, by 7.68%. But Watsonville's *as-adjusted* hourly wage costs for fiscal year 2000 was $23.02. *Id.* at 126. Watsonville's as-reported 2001 figure thus exceeded its as-adjusted 2000 figure by 16.33%. Although the precise edit threshold remains confidential, there is no dispute that the 16.33% variance exceeded the threshold.[3] Dkt. 21-1 at 205. Watsonville's fiscal intermediary, United Government Services ("UGS"), accordingly, reduced Watsonville's average hourly wage from $26.78 (the as-reported average) to $23.02 (the as-adjusted rate from the most recent year for which a final adjusted figure was available) "pending an explanation from" Watsonville. Dkt. 21-1 at 6; *see also id.* at 204–05.

CMS notified Watsonville of the proposed adjustment in a letter dated November 11, 2002 (and received by Watsonville on November 14, 2002). Dkt. 21-1 at 356. That letter gave Watsonville ten days to dispute the adjustment and to provide "explanations and documentation for any disagreed items." *Id.* Watsonville did not respond. Dkt. 13-1 at 11; Dkt. 15-1 at 14. A month later, on December 13, 2002, CMS wrote to the California Healthcare Association ("CHA" or the "Association"), the state hospital association that represents Santa Cruz-area hospitals, to alert the Association that Watsonville had not responded to the request for more information stemming from the desk review and to "advise the hospital association to inform its member hospitals that a hospital's failure to respond to matters raised by the intermediary can result in the data being disallowed, thereby, possibly lowering an area's wage index value." Dkt. 21-1 at 365. As discussed below, it is disputed whether the CHA ever actually received the

---

[3] Dignity argues that the UGS audit report, which accompanied the November 22, 2002, letter, actually noted a 40.06% variance between Watsonville's 2001 and 2000 rates, *see* Dkt. 13-1 at 9–10, but all agree that the consequence of exceeding the edit threshold were the same whether the variance was 16.33% or 40.06%.

letter. Watsonville, however, was copied on the CMS letter, *id.* at 366, and there is no indication in the record that it did not receive the correspondence.

CMS wrote to Watsonville again on January 6, 2003, to alert it that CMS would publish the "preliminary public use" file on January 10, 2003, and that the deadline for hospitals to submit requests for revisions of their wage data was February 10, 2003. Dkt. 21-1 at 370–71. The letter explained that "a hospital that wishes to revise its data must submit its request along with <u>complete</u> appropriate detailed documentation to its [fiscal] intermediary" by the February 10, 2003, deadline. *Id.* at 371 (emphasis in original). As promised, CMS released the "preliminary public use" file on January 10, 2003, *Proposed 2004 Rule*, 68 Fed. Reg. at 27,193, but it extended the deadline for proposed revisions to February 17, 2003, *id.* Watsonville, however, "failed to pursue [the] administrative remedy created specifically to address" any dispute it may have had with its fiscal intermediary regarding the wage data included in the "preliminary public use" file. Dkt. 21-1 at 8.

The Secretary published the "final public use" file on May 9, 2003, *see* Dkt. 21-1 at 161; *id.* at 307, and published the proposed wage index on May 19, 2003, *see Proposed 2004 Rule*, 68 Fed. Reg. at 27,245–352. Shortly after CMS published the proposed wage index, CHA wrote to UGS, indicating that CHA had not received the "required notice from . . . UGS . . . regarding Watsonville's difficulty with the desk review process" and expressing concern that the "wage index adjustment for Santa Cruz, California will be negatively affected by errors in Watsonville Hospital's wage data submission." Dkt. 21-1 at 298. According to CHA, had it received that notice, it would have contacted Watsonville and would have "offer[ed] the association's assistance" in correcting the data. *Id.* CHA requested that UGS give Watsonville "the opportunity to provide the additional documentation necessary to correct the wage date before

the June 6 deadline" and added: "We understand that the facility has the information ready and is eager to work with UGS to get the data corrected." *Id.*

UGS met with representatives of all three Santa Cruz-area hospitals on June 3, 2003. Dkt. 21-1 at 110; *id.* at 170. Watsonville did not, however, provide documentation "sufficient" to address the concern raised in the course of the UGS "desk review," and, in particular, did not provide "the payroll data supporting the number of hours [worked, or] the amounts paid for those hours." *See* Dkt. 21-1 at 210. The next day, June 4, 2003, Watsonville wrote to CMS—and copied UGS—requesting that CMS accept the $26.78 hourly rate it had originally filed. Dkt. 21-1 at 6; Dkt. 21-1 at 304–05. Watsonville asserted three errors: (1) that CHA did not receive the required notice, (2) that UGS "[m]iscalculated the percentage change between 2001 and [the] prior year," and (3) that UGS should not have used adjusted data for "two years in a row." *Id.* at 304. Although that letter asserts that it was accompanied by "[a]n outline and supporting documentation with regard to the fiscal intermediary errors," it appears that this "documentation" consisted of the same material provided at the June 3, 2003, meeting, *id.* (citing to "summary of meeting with UGS on June 3, 2003"), and that, to this day, Watsonville has not provided "auditable and verifiable documentation establishing what the wages [were] in [the] years" at issue, *id.* at 164 (Tr. 41).

CMS denied Watsonville's request in an undated letter received by Watsonville on July 14, 2003, stating that the request "does not meet the conditions for processing revisions to the final wage data," because only requests "to correct errors due to the intermediary's or CMS's handling of the data that the hospital could not have known about before the release of the final wage index public use file on May 9, 2003" could be processed at that time. Dkt. 21-1 at 307. The Secretary published the final wage index on August 1, 2003. *See Medicare Program;*

*Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates*, 68 Fed. Reg. 45,346 (August 1, 2003) ("*Final 2004 Rule*").

C.	**Proceedings Before the Provider Reimbursement Review Board**

On January 15, 2004, Plaintiff—along with Watsonville and Sutter Maternity & Surgery Center—timely requested a hearing before the Provider Reimbursement Review Board ("Board"), an independent administrative tribunal within CMS responsible for adjudicating disputes relating to Medicare reimbursement issues. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1837; Dkt. 21-1 at 7, 286–88. The Board dismissed Watsonville's appeal because the hospital did not respond to UGS's November 11, 2002 letter, and thus failed to exhaust administrative remedies. Dkt. 21-1 at 7 n.14. The appeal proceeded, however, with respect to the two remaining petitioners, and the Board conducted a hearing on January 29, 2014. *Id.* at 4, 7. The Board issued its decision on April 2, 2015. *Id.* at 12.

The Board's decision first considered whether the "the case was appropriate for expedited judicial review." *Id.* at 7–8. Under the governing statute and regulations, if (1) a case "involves a question of law or regulations," and (2) the Board concludes that "it is without authority to decide the question," the provider may bring a civil action within sixty days of receiving notice of that determination and without engaging in the futile process of exhausting an unavailable administrative remedy. 42 U.S.C. § 1395oo(f)(1); *see also* 42 C.F.R. § 405.1842. Here, the Board concluded that it, in fact, lacked authority to afford the hospitals any relief, because the Secretary had failed "to provide a remedy for other hospitals in the same MSA which are harmed by the hospital that failed to furnish correct wage index data." Dkt. 21-1 at 8. Yet, it nonetheless held that "expedited judicial review" was unavailable because Plaintiff's challenge did not involve a question of law and, instead, turned on "disputed facts surrounding whether the

Watsonville wage data was incorrect." *Id.* To add to this confusion, the Board further concluded that, despite the unavailability of a remedy, it had jurisdiction over the dispute. *Id.* at 7–8. The Board, therefore, reached what it aptly characterized as "an anomalous result"—that is, that it was required to "resolve the fact issue even though it ha[d] no authority to grant a remedy." *Id.* at 8.

Turning to the first factual issue, the Board acknowledged the dispute over whether UGS had provided the required notification of Watsonville's failure to respond during the desk review process to CHA, but it declined to resolve that dispute. *Id.* at 9. As the Board explained, CHA was not a party to the appeal and, in any event, the relevant rules "provide no remedy for a State hospital association or a hospital in an MSA in which another hospital is nonresponsive to a wage index audit request for additional information." *Id.* "In this regard," the Board observed, it "ha[d] no authority to disregard documentation obligations of one hospital to the benefit of other hospitals in an MSA." *Id.* Even putting this difficulty to the side, however, the Board found "that there [was] sufficient evidence of other communications between [UGS], Watsonville, and CHA which otherwise put the parties on notice of Watsonville's noncompliance with [UGS's] request and provided the parties with opportunity *for purposes of this appeal* to supply the data/documentation to refute [UGS's] adjustment." *Id.* (emphasis in original). In particular, the Board found that CMS published the "preliminary public use" file in January 2003, and that "a comparison to the prior two years' wage index for Watsonville would have shown a flat wage index for Watsonville for three years." *Id.* at 10. The Board, therefore, concluded "that, *for purposes of this appeal*, the Hospitals (and CHA through the Hospitals) . . . had sufficient opportunity to submit to the" fiscal intermediary "any documentation and/or information to

support correction of the alleged error in Watsonville's FFY 2004 wage index." *Id.* (emphasis in original).

The Board was also unpersuaded on the merits, finding that the fiscal intermediary's "requests for additional documentation from Watsonville during its review of both FFY 2003 and FFY 2004 wage index data were proper under Medicare rules" and that "Watsonville failed to provide the necessary documentation to justify its wage data for either of th[o]se years." *Id.* at 11. It was not, in the Board's view, the fiscal intermediary's "'error' but rather Watsonville's lack of response to . . . requests for supporting documentation to justify its wage data that caused the wage rate issue for all hospitals within the geographic area." *Id.* And, the Board further found "that, as part of this appeal," none of the hospitals "provide[d] sufficient documentation to support reversal of the" fiscal intermediary's "adjustment." *Id.* Their "generic 'reasonableness' arguments" were, according to the Board, an inadequate substitute for the required "provider-specific information or documentation." *Id.* The Board, accordingly, found that "the [h]ospitals ha[d] not met their burden of proof" and that the determinations of the fiscal intermediary and CMS must stand. *Id.*

Providers "have the right to obtain judicial review of any final decision of the Board . . . by a civil action commenced within 60 days of the date on which notice of any final decision by the Board . . . is received." 42 U.S.C. § 1395oo(f). Plaintiff timely filed its complaint in this Court on June 1, 2015. Dkt. 1.

## II. ANALYSIS

Although neither party has raised the issue, the Court must assure itself that it has jurisdiction before turning to the merits. *See, e.g.*, *Utility Air Regulatory Grp. v. EPA*, 320 F.3d 272, 277 (D.C. Cir. 2003). The Court's jurisdiction is, of course, limited to "actual cases or

controversies between proper litigants," *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996) (en banc), which means, among other things, that Plaintiff must have Article III standing, *see Abulhawa v. U.S. Dept. of Treasury*, 15-cv-2186, 2017 WL 883609, at *4 (D.D.C. March 4, 2017). In general, "[t]he plaintiff bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Because these elements are "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

"[T]he irreducible constitutional minimum of standing contains three elements:" The plaintiff must establish (1) that it has suffered an "injury in fact" that is "actual or imminent" and "not conjectural or hypothetical;" (2) that "a causal connection [exists] between [that] injury and the conduct complained of;" and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (citations omitted). Although this case is before the Court on cross-motions for summary judgment, which might ordinarily require that Plaintiff submit evidence to support its standing, this is not a case in which declarations or other evidence are necessary. As the Court of Appeals has observed, there are times at which a plaintiff's "standing to seek review of [an] administrative action is self-evident," so that "no evidence outside the administrative record is necessary for the court to be sure of it." *Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002). The same principle applies, moreover, where the *absence* of standing is evident from the administrative record. Here, the principal difficulty Plaintiff confronts is not the product of a lack of evidence, but, rather, appears on the face of the administrative record.

13

As the Board found, there is little doubt that Plaintiff was "adversely affected by the Watsonville FFY 2004 wage data determination," Dkt. 21-1 at 7, and, accordingly, Plaintiff readily satisfies the "injury in fact" requirement. Similarly, the Court does not doubt that Plaintiff can establish a causal link between that injury and its claim that the Secretary should have applied Watsonville's wage data as-reported—and not as-adjusted—to calculate the Santa Cruz-area wage index. Redressability, however, poses a more substantial hurdle. "Redressability examines whether the relief sought, assuming the court chooses to grant it, w[ould] likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 663–64. When redressability "depends on the unfettered choices made by independent actors not before the court[] and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," moreover, "it becomes substantially more difficult to establish standing." *Scenic Am., Inc. v. U.S. Dep't of Trans.*, 836 F.3d 42, 50 (D.C. Cir. 2016) (quotation marks omitted); *see also West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017); *Abulhawa*, 2017 WL 883609, at *7. Plaintiff's challenge to the Secretary's decision raises two potential redressability problems.

**A.     Watsonville's Documentation**

First, to the extent Plaintiff contends that the Court should order the Secretary to now permit Watsonville to submit the documentation that it failed to submit years ago in support of its as-reported FFY 2002 wage data, *see* Dkt. 1 at 10, it is far from clear that Watsonville would do so. The hospital was repeatedly offered the opportunity to submit this documentation in the administrative process, yet it failed to take advantage of those opportunities. *See, e.g.*, Dkt. 21-1 at 356 ("Please review the adjustments" and provide "explanations and documentation for any disagreed items" within "10 days[.]"). It is now fourteen years later, Watsonville has been

denied relief on the ground that it failed to exhaust administrative remedies, and there is no evidence that it is now "likely" to produce the long-missing documentation. Under these circumstances, and given the reluctance of courts to "speculate how independent actors not before them might exercise their broad and legitimate discretion," *West*, 845 F.3d at 1237 (quotation marks and alteration omitted), the Court cannot conclude that an order directing the Secretary to accept the documentation would redress Plaintiff's asserted injury. Although this does not dispose of Plaintiff's entire challenge—much of which is directed at the record as it existed at the time CMS denied Watsonville's request to accept the as-reported FFY 2002 wage data—it does mean that Plaintiff lacks standing to argue that Watsonville should now be permitted to supply the requested documentation. *See id.* at 1235 ("[S]tanding is not dispensed in gross but instead may differ claim by claim[.]") (citation omitted).

**B.     The Board's Alternative Holding**

This, however, leads to a second and more fundamental redressability problem: The Board's decision rested on two independent grounds, and Dignity challenges only one of them. Before it considered the merits, the Board concluded that it lacked authority to "grant a remedy" to *Plaintiff* based on a challenge to *Watsonville's* wage data. Dkt. 21-1 at 7–8. Although the Board did go on to address the merits of Plaintiff's challenge to the accuracy of Watsonville's as-adjusted wage data, it recognized that it was "anomalous" to resolve that issue in a case in which it had "no authority to grant a remedy." *Id.* at 8. In a case with "*two* alternative grounds on which [an agency] based its finding," and in which the plaintiffs "have not challenged" one of those grounds, the D.C. Circuit has held that the Court "must assume, at least for the purposes of [its] standing analysis, that the . . . unchallenged finding . . . was valid." *Cnty. of Del., Pa. v. Dep't of Transp.*, 554 F.3d 143, 149 (D.C. Cir. 2009). As a result, "[o]verturning the [first

ground] will not redress the [plaintiff's] harm," and the plaintiff will, accordingly, lack standing. *Id.* at 149–50 This is such a case: Given the Board's alternative holding, even if the Court were to set aside the Board's decision on the merits and were to sustain Plaintiff's claim that the Secretary unreasonably relied upon inaccurate wage data, Plaintiff would not be entitled to any relief on remand; the Board would still lack "authority to grant a remedy" to Plaintiff, and thus Plaintiff's asserted injury would remain unredressed.

Although neither party frames the issue in terms of standing, they do address the Board's alternative holding on the merits, and those arguments substantially overlap with this jurisdictional inquiry. As the Secretary explains, the Board based its conclusion that Plaintiff was not entitled to challenge Watsonville's wage data on the August 1, 2003, final rule setting the 2004 wage index. *See* Dkt. 21-1 at 7–8 (citing *Final 2004 Rule*, 68 Fed. Reg. 45,346). The Final 2004 Rule, like the Proposed 2004 Rule, "created [a] process . . . to resolve *all* substantive wage data correction disputes," and like the Proposed 2004 Rule, it explained that "[i]f a hospital wished to request a change to *its* data as shown in [the wage data file], the hospital was to submit corrections along with complete, detailed supporting documentation to *its* intermediary by" the specified date. *Final 2004 Rule*, 69 Fed. Reg. 45,401–02 (emphasis added); *Proposed 2004 Rule*, 68 Fed. Reg. 27,193 (emphasis added). The Final 2004 Rule further observed that the Proposed 2004 Rule "described the process for hospitals to review and revise *their* . . . wage data." 68 Fed. Reg. 45,401 (emphasis added). And, the Final 2004 Rule explained that "[h]ospitals were notified of [the] deadline and . . . the requirement to review and verify *their* data as posted on the preliminary wage data file" and that, after the final wage data file was published, a hospital would still have a limited ability to seek a correction of "*its* wage data." *Id.* at 45,401-02 (emphasis added). Given this focus on a hospital's ability to challenge *its own*

16

wage data, it is not surprising that the Board concluded that the Secretary did not "provide a remedy for *other* hospitals in the same MSA which are harmed by the hospital that failed to furnish correct wage index data." Dkt. 21-1 at 8 (emphasis added).

The Secretary contends that, in light of this conclusion, Plaintiff cannot prevail in the present litigation. As he explains, "Plaintiff is complaining not about its own data but the data that CMS used for a different hospital in the MSA;" the Board "reasonably held that the Secretary's regulations do not grant a provider the right to challenge another provider's data in the correction process;" and "Plaintiff does not challenge this aspect of the final agency decision." Dkt. 15-1 at 26–27. In response, Plaintiff makes only two arguments. First, it contends that it is not "challenging another provider's data," but rather "the FFY 2004 wage index for the Santa Cruz MSA and the manner in which the Secretary established that wage index." Dkt. 17 at 12. Second, it argues that it is "entitled" to bring such a challenge and, indeed, that the Board "said as much in its opinion." *Id.* The Court is not convinced on either point.

As an initial matter, the Secretary is correct that Plaintiff did not challenge the Board's reading of the Final 2004 Rule or the rule's procedural requirement that the only hospital that may challenge the reporting hospital's wage data is the reporting hospital itself. To the contrary, the complaint makes one, and only one, claim: that the Secretary "improperly determined the wage index for [the] Santa Cruz MSA FFY 2004." Dkt. 1 at 2, ¶ 5; *see also id.* at 8, ¶ 35 ("CMS, through [UGS], made improper adjustments for Watsonville that resulted in an improper and inaccurate determinate of the average hourly wage for Watsonville."). To be sure, the complaint does note that the Board concluded that it lacked "the authority to grant the remedy" that Plaintiff sought, *id.* at 7, ¶ 29, but it only does so in describing the background; it never

17

alleges that that conclusion was arbitrary, capricious, or contrary to law. The contention that the annual wage index calculation process must permit *every* provider to cross-challenge *every other* provider's wage data, moreover, is far too significant to read into the complaint in the absence of any affirmative allegation. Nor is Plaintiff entitled to amend its complaint by raising an argument in a reply brief. *See, e.g.*, *Harrison v. Office of the Architect of the Capitol*, 964 F. Supp. 2d 81, 95 n.4 (D.D.C. 2013). Absent such a challenge to the Board's conclusion that it lacked authority to provide Plaintiff with a remedy, however, Plaintiff cannot establish redressability. *See Cty. of Del., Pa.*, 554 F.3d at 149. The absence of a challenge to the Board's conclusion that it lacked authority to grant Plaintiff "a remedy" thus stands as an insurmountable roadblock to review of the Board's factual determination about the accuracy of the wage index. See Dkt. 21-1 at 8.

Plaintiff attempts to sidestep this difficulty, arguing that it is not "challenging another provider's data," but rather "the manner in which the Secretary established [the] wage index," and that the Board actually *affirmed* its entitlement to bring such a challenge. Dkt. 17 at 12. In support of this contention, Plaintiff observes that the Board concluded that Plaintiff had "'the right to hearing'" regarding the amount of its payments, and it points to the CMS Administrator's decision in *D.C. Hospital Association Wage Index Group Appeal*, HCFA Administrator Decision (Jan. 15., 1993), reprinted in [Sept. 1992–March 1993 Transfer Binder], Medicare & Medicaid Guide (CCH) ¶ 41,025, at 34,425 ("*D.C. Hosp. Ass'n*"); *id.* (quoting Dkt. 21-1 at 7–8), which the Board cited in its decision. Neither contention, however, withstands scrutiny.

Plaintiff is correct that the Board concluded that Plaintiff had "the right to a hearing before the Board." Dkt. 21-1 at 7. That right, however, was a hollow one. As the Board put it, although it had "jurisdiction over the Hospitals, it lack[ed] the authority to grant the remedy that

18

[they sought], namely updating the Santa Cruz MSA wage index with the alleged correct Watsonville [fiscal year] 2004 wage index data." *Id.* at 8. Although the Court is not convinced that the Board was required to "resolve the fact issue even though it ha[d] no authority to grant a remedy," *id.*, it did not, by doing so, disavow its independent conclusion that it lacked authority to correct Watsonville's wage index data. Nor does Plaintiff's reliance on *D.C. Hospital Association* advance its cause. That administrative decision merely holds that a provider may bring a challenge to the Secretary's final determination setting the wage index, rather than waiting to file a cost report and then challenging the provider's individual reimbursement determination. *See D.C. Hosp. Ass'n*, Medicare & Medicaid Guide (CCH) ¶ 41,025 at 34,425–26. And, even though the *D.C. Hospital Association* decision implicitly recognizes that a provider may challenge the Secretary's determination of the wage index without "seeking to correct [that] individual facility's wage data," Dkt. 21-1 at 8, it does not even hint at the proposition that the Secretary must adjust the wage index for an MSA based on a challenge to a specific hospital's wage data brought by a different hospital. Rather, in that case, a group of D.C. hospitals argued that the Secretary incorrectly included all of them in an MSA that also included Maryland and Virginia. *D.C. Hosp. Ass'n*, Medicare & Medicaid Guide (CCH) ¶ 41,025 at 34,425.

The Court, accordingly, concludes that the Board's rejection of Plaintiff's administrative appeal stands on an independent ground, which Plaintiff has not challenged in its complaint. Because Plaintiff, as a result, would not be entitled to relief even if it were to prevail on the claims alleged in the complaint, the Court concludes that Plaintiff's claims are not redressable and that Plaintiff, therefore, lacks standing to pursue those claims. *See, e.g.*, *Renal Physicians Ass'n v. U.S. Dep't of Health and Human Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007).

## CONCLUSION

For the reasons explained above, the Court will dismiss the action for lack of jurisdiction and will deny both Plaintiff's motion for summary judgment, Dkt. 13, and the Secretary's cross-motion for summary judgment, Dkt. 15, as moot.

A separate order will issue.

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date: March 21, 2017